Order may be drawn in accordance with this opinion.

Guiseppe RUSSO, Libelant,

v.

UNITED STATES of America,
Respondent,
and
Universal Terminal & Stevedoring Company, Impleaded-Respondent.

No. 18381.

United States District Court,
E. D. New York.

Dec. 30, 1954.

Joseph C. Victor, Brooklyn, N. Y.; By Nemo Convisser and Benedict S. Rosenfeld, Brooklyn, N. Y., for libelant.

Leonard P. Moore, U. S. Atty., for Eastern Dist. of New York, Brooklyn, N. Y., for respondent United States of America, Tompkins, Boal & Tompkins, New York City, Arthur M. Boal, New York City.

Galli & Locker, New York City, By Patrick J. McCann, New York City, for Universal Terminal & Stevedoring Co., impleaded respondent.

RAYFIEL, District Judge.

The libelant, a longshoreman, brought this action under the Suits in Admiralty Act, Title 46 U.S.C.A. § 741 et seq., to recover damages for personal injuries sustained by him on Sunday, February 10, 1946, on board the James Lykes, a vessel owned by the respondent, United States of America, while it was at Pier 8, Brooklyn, loading cargo. The respondent impleaded the libelant's employer, Universal Terminal and Stevedoring Company.

The testimony in the case revealed that the libelant had worked in the number one hold of the vessel for several days prior to the accident, and that at about 4:45 P.M. on February 10, 1946, he and his fellow-employees were engaged in replacing the pontoon covers on that hold. The covers, which were about fifteen feet long and five or six feet wide, had been placed on the deck alongside the hold earlier that day. The two winches at the number one hold were being used to lift them from the deck into position to cover the hatch opening. The falls controlled by the winches had been joined together and rigged with a bridle containing four chains, at the ends of which were four hooks, one of which was to be inserted into a ring at each corner of the pontoon. The first pontoon had been lifted from the deck to its position over the hatch opening without incident. The bridle had been lowered by the winches to the side of the hatch, preparatory to raising the second pontoon cover from the deck. The libelant was standing between that pontoon and the hatch coaming, and was holding two of the hooks which he was preparing to insert into the

corners of a short side of the pontoon; another longshoreman had taken the remaining two hooks and had inserted them into the opposite corners of the pontoon when suddenly the pontoon was caused to be raised from the deck and the libelant felt himself squeezed against the hatch coaming by the pontoon cover, causing the lower part of his right leg to be injured. He testified that he did not know what caused the pontoon to be raised.

The two principal witnesses for the libelant were Carmine D'Ambrosio, the operator of the starboard winch at the number one hold, and Frank Capadonna, the foreman in charge of the longshoremen during the loading operation. D'Ambrosio testified that there were two electric winches at the number one hold which were operated through control boxes. He operated the starboard winch, called the up and down, and someone else operated the port winch, called the Burton. A control box of the type used on the Lykes on the day of the accident was introduced in evidence. It had a metal handle or lever about eleven inches long, which controlled the speed of operation of the winch. It also had a small switch which was used to cut off the power completely. D'Ambrosio testified that as the control handle was moved forward from the neutral or stop position the speed of the winch increased. The movements of both winchmen were controlled by a gangwayman or signalman, who gave directions as to the manner in which the winches were to be raised or lowered. D'Ambrosio stated that immediately prior to the accident he was watching the gangwayman, waiting for a signal, when his winch, although its handle was in the neutral position, suddenly started to operate, raising the pontoon cover from the deck, and causing it to strike the libelant, pinning his leg against the hatch coaming. He testified that for a few days prior to the accident he had had difficulty with this winch; that on occasion, without being touched, it would start operating while the handle was in the neutral or stop position; that

he had told this to the foreman, Frank Capadonna; that when he heard the libelant shout after being struck he moved the handle into reverse, then back to neutral, and shut off the power.

Frank Capadonna testified that he was in charge of the longshoremen, numbering forty to sixty, who were on board the Lykes during the loading operation; that a day or two before the accident he spoke to one of the officers, whom he called a mate, and told him that the up and down winch at the number one hold was not working properly; that the said officer told him that he would send an electrician; that at about 8:15 in the morning of the day of the accident, he spoke to another officer, whom he called the second mate, about the same winch, which, he told him, was not working properly, and that an electrician worked on the winch for a half an hour, after which the longshoremen resumed their work.

This witness also testified that the gangwayman and the man who operated the Burton winch were both deceased, and that the man who acted as the hatch boss at the number one hold on the day of the accident was in Italy at the time of the trial.

The respondent denied that the accident occurred in the manner described by the libelant's witnesses. It based its defense on three contentions: First, that there was nothing wrong with the winch in question; second, that the accident was caused by the negligent operation of the winch by the winchmen, who were fellow employees of the libelant; and third, that it was physically and mechanically impossible for the accident to happen as described by the libelant's witnesses.

To sustain its first contention the respondent called as witnesses various ship's officers, who testified that they had observed the operation of the winch in question; that there was nothing wrong with it either before or after the accident; that no complaint had ever been made concerning its operation, and

that no repairs had been made to it during the period of the loading operation.

To sustain its second contention it called on Walter Burns as a witness. He testified that he was the night mate aboard the vessel while it was loading at Pier 8; that on Sunday, February 10, 1946, the date of the accident, he was the only officer on board, and was in charge of the ship; that he observed the longshoremen while they were engaged in closing the number one hold and saw the accident to the libelant; that it was caused by the negligence of both winchmen in so raising the pontoon as to cause it to strike the libelant; that after the accident the libelant was placed on a pallet, which was then lowered to the dock without incident by the same two winches which were used by the longshoremen to replace the pontoons.

To sustain its third contention it called two witnesses, Francis J. Donohue, an electric service supervisor for the Westinghouse Electric Corporation, the manufacturer of the electrical equipment installed on the vessel, and William M. Finkenauer, marine architect and ship surveyor. Mr. Donohue testified as to the mechanical operation of the winch control box and Mr. Finkenauer as to tests which he caused to be made on two sample control handles of the type used on the Lykes. He testified that it would be necessary to bend the handle three inches for the knob to be in the neutral position while the spindle of the shaft is in the first notch of the forward position; and that if it had been bent only ¾ of an inch it could not be used to operate the winch.

It appears then that the only material fact on which the libelant and respondent agree is that the libelant was injured on the date in question on board the Lykes. In view of the sharp conflict it becomes necessary to examine and analyze the testimony of each witness with great scrutiny.

The testimony of the libelant and the witnesses D'Ambrosio and Capadonna, given through an interpreter, presented some problems, due chiefly to the diffi-

culty in translating some of the questions asked of them into Italian idiom and some of their answers into their English equivalents. However, I was favorably impressed with their testimony. The libelant was frank in saying he did not know how the accident occurred, except to state that his leg was struck by the pontoon cover. D'Ambrosio had been a winchman for many years. He was positive that he had received no signal from the gangwayman or signalman. I believed him as I did his statement that he did not start his winch in operation, but that it started without his touching the controls, causing the pontoon to be lifted. He was standing near the control box at the time and was in the best position to know whether he started it.

The testimony of the ship's officers concerning the condition of the winches, and to the effect that they all operated perfectly is controverted by the testimony of Stefen Wolossow, the chief electrician on the Lykes. His deposition was taken by the respondent, and was read as part of the libelant's case. He was the person directly responsible for the care and condition of the winches. On cross examination he testified that he had had trouble with the number one *port* winch, and that he had told the chief engineer about it. He testified that the handle had been struck and bent and thereafter straightened. The libelant offered in evidence a statement by this witness (Libelant's Exhibit 7) in which he said, "On the day I went ashore I notified the chief engineer that he should tell the longshoremen to be careful in operating number one winch (*starboard*) because the winch had been damaged sometime before and was giving lots of trouble in its operation." (Emphasis added.)

The respondent, in its brief, urges the Court to disregard Wolossow's testimony completely by reason of its conflict with the statement which he gave to the respondent on December 7, 1949 (Respondent's Exhibit 3), in which he said that there was nothing wrong with the controller of any winch on the ship. Nevertheless during a searching cross-examination during the course of his deposition there was elicited from him the testimony that the port winch handle at number one hold was defective, and that he had informed the chief engineer of that fact.

I was not favorably impressed with the testimony of the night mate Walter Burns. He testified that number four, number two and number one holds were closed consecutively in that order, and that he was present at each of said holds when it was closed. Since he testified that it took about fifteen minutes to close each hold, and since the accident to the libelant occurred at about 4:50 P.M. it would mean that the longshoremen began to close the number four hold at about 4:15 P.M., the number two hold at 4:30 P.M. and the number one hold at about 4:45 P.M. However, he made no log entry indicating these facts. His only log entry respecting that work was "5:00 stevedores K.O. (*knocked off—discontinued work*) all hatches closed." (Matter in parentheses added.) Longshoremen are paid only for the time they actually work; yet the log entry indicated that they were paid for working until 5:00 P.M., although according to the testimony of Burns, one-third of them worked only until 4:30 and one-third until 4:45 P.M. He also testified that he made no report of the accident except the following log entry: "4:50 Joseph Russo longshoreman injured with hatch cover while closing hatches taken to St. Peter's Hospital with apparently broken leg." There were no details concerning the place where or the manner in which the accident happened. The log disclosed that the master was aboard the Lykes on the day of the accident, but he was not called to the scene nor did he make a report. I do not believe that Burns saw the accident.

We come now to respondent's third contention, namely, that it was impossible mechanically, for the accident to have occurred as described by the libelant's witnesses, and to the tests made in support of that contention. Respondent's chief electrician, Wolossow, controverted such a contention in his deposition when

he made the following answers to the questions asked of him (page 17 of his deposition):

"Q. Did you complain to him about that? A. Yes, because I says I have to stop the man and get the handle off and straighten it out.

"Q. Now what was the trouble with the port side No. 1 winch. A. Well, that is only the handle, because when his handle is bended he can't put it in neutral.

"Q. In other words, the handle was bent and because it was bent the machine would not operate efficiently? A. Yes."

And at page 18 of his deposition:

"Q. Do you remember telling him that this No. 1 port side winch had been damaged sometime before? A. Yes; because a strong man always jams it on full speed and it stops with that handle. When he bends there is a little tail of the handle, it bends like this (indicating) when you bring it up to neutral, he can't make the neutral because it is a little too much bended, *so it means the contact is going to energize*, so it has to bend back again so it gets straight." (Emphasis added.)

This testimony was elicited from an obviously hostile witness, who was the person in charge of the electrical control boxes, and who was in a position to observe their operation under actual working conditions on board the vessel. The respondent failed to produce the handle in question at the trial, despite the fact that it had notice that the libelant claimed that the injuries which he sustained resulted from the defective handle on the number one starboard winch.

■ Accordingly I find that the accident was caused by the unseaworthy condition of the Lykes, due to the defective condition of the winch in question, by reason whereof the libelant did not have the reasonably safe place to work to which he was entitled. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

■ I find also that the accident was in no way caused by negligence on the part of the respondent-impleaded, and therefore the cross claim against the Universal Terminal and Stevedoring Company is dismissed.

■ We come now to the question of damages. At the time of the accident the libelant was forty-nine years of age. He had been employed as a longshoreman for over fifteen years and prior to the accident had been in good health, although he had been involved in an accident in December, 1942. At that time he sustained a fracture of the right ankle, which caused him to be hospitalized from December 7, 1942 to December 10, 1942, and which incapacitated him for a period of eight months. After the accident which occurred on the Lykes on February 10, 1946, he was taken to St. Peter's Hospital, in Brooklyn, where it was found that he had sustained compound comminuted fractures of the right tibia and fibula. He was confined there until May 25, 1946. After his discharge he was treated by Dr. Eugene Patella once a week for about a year and then by Dr. Julius Schoenfeld about once a week for more than a year. In walking he was obliged to use two crutches for a period of a year and a half after the accident; thereafter one crutch and a cane, and finally only a cane for about two and a half years. At the time of the trial the libelant walked with a conspicuous limp. There is evidence that the accident resulted in a one-half inch shortening of his right leg. He testified that he suffered pain in the injured leg and for that reason was unable to work more than four hours a day.

The libelant testified that he was unable to engage in any work until March, 1948, when he obtained part-time employment as a porter at an average wage of $15 per week. He continued in that work until October, 1948. Thereafter he was unemployed until February, 1949, when he obtained employment at $26 per week for a twenty hour week.

The payroll records of the libelant's employer, the respondent-impleaded, revealed that he had earned $2,752.03 for

the year 1944 and $2,268.89 for the year 1945. The testimony is that the libelant was incapacitated for a period of two years and his annual earnings averaged $2,500, so that his loss of earnings for this period amounts to $5,000. At the time of the accident he was forty-nine years of age. Considering his age and his general appearance and condition at the time of the trial it does not appear likely that he would have been able to continue to perform the arduous physical labor required of a longshoreman beyond the age of fifty-five. I find therefore that in addition to the $5,000 loss of earnings hereinabove referred to the libelant is entitled to recover the further sum of $10,000 for loss of earnings and pain and suffering.

It was conceded that the sum of $1,482.92 was expended for hospital and medical services.

Accordingly the libelant is awarded judgment against the respondent in the sum of $16,483.92.

Submit proposed findings of fact, conclusions of law and judgment in conformity herewith.