Guiseppe RUSSO, Libelant,

v.

UNITED STATES of America, Respondent

and

Universal Terminal & Stevedoring Co., Inc., Impleaded-Respondent.

No. 18381.

United States District Court E. D. New York.

May 5, 1958.

Joseph C. Victor, Brooklyn, N. Y., for libelant, Alfred S. Julien, New York City, of counsel.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., proctor for United States, Tompkins Boal & McQuade, New York City, of counsel.

Galli & Locker, New York City, proctors for impleaded-respondent, Patrick J. McCann, New York City, of counsel.

ABRUZZO, District Judge.

This is a suit in Admiralty brought by the libelant against the respondent, United States of America, owner of the ship James Lykes. The libelant, a longshoreman, was in the employ of the impleaded-respondent, Universal Terminal & Stevedoring Company, Inc., doing longshore work on the ship at the time of his accident.

The case was tried heretofore in this Court and a decree was found in favor of the libelant. The opinion upon which this decree is based is reported in 126 F.Supp. 911. Upon appeal the Circuit Court reversed and remanded the case for further proceedings consistent with its opinion. That opinion is reported in 228 F.2d 317.

The facts upon which the lower court made its decision and the Circuit Court reversal are amply set forth in both opinions and do not need repetition. The record of the previous trial was stipulated by both parties as evidence in the trial before me. Additionally, three expert witnesses were called and testified in open court. Two were called by the libelant and one by the respondent.

At the first trial the libelant based his right to recovery on the unseaworthy condition of the James Lykes in that the

handle of the winch was bent and this defective condition caused the winch, while its handle was in a neutral position, to start 15 or 20 times a day of its own accord. This was the purport of the testimony of d'Ambrosio, the operator of the winch. That contention has now been abandoned and the libelant's claim to a decree is based upon the evidence of his two experts.

The testimony of Isaac Stewart is not helpful. He failed to qualify as an expert and his testimony cannot be considered as having any probative value.

Professor Bond, the other expert called by the libelant, was amply qualified as a winch expert, particularly with class 8590 Westinghouse winch being used aboard the James Lykes and its control mechanism. Exhibit No. 1 contains a diagram of the thirty-odd wires that entered the control box. Professor Bond, using this exhibit, testified that in order for this winch to be energized and permit electricity to flow through, without any action on the part of the operator d'Ambrosio, it was necessary that two short circuits would have to occur involving four wires, Wire No. 7 would have to be short-circuited with Wire No. X2 and Wire No. 8 would have to be short-circuited with Wire No. 25. He identified these wires on the diagram of the wires in the control box on Exhibit No. 2. Professor Bond testified that these four wires would necessarily have to short-circuit simultaneously. This the libelant now claims is the only way the winch could have started up without d'Ambrosio moving the control handle.

The respondent's expert, Donohue, corroborates Bond to the extent that if these four wires short-circuited simultaneously the winch would move of its own accord, but the probability of this occurring was very remote.

Bond testified that these short circuits could occur from atmospheric conditions causing the insulation of these four wires to be damp or wet or, if the insulation on the four wires was so worn that the bare wires would touch each other.

The Circuit Court in reversing the lower court stated as follows (228 F.2d at page 318):

"What we cannot accept, however, is the testimony of d'Ambrosio, the winchman, the substance of which was as follows: 'For a half minute it would stop and then it would start again.' 'When it was in neutral, a half minute later it would start to go * * * 15, 20 times a day.' 'I didn't touch the winch; I was awaiting orders from the gangwayman.' 'I was watching the gangwayman and all at once the winch start in going ahead.'

"There is no escape from taking this testimony to mean that at least thirty seconds after the witness moved the handle to a position in which it turned off the current and stopped the winch, it started to revolve of itself; that is, without any change in the position of the handle at which it had successfully cut out the current. It is one thing to say that, when the handle was put at neutral it did not cut off the current; one can imagine that that might happen. Indeed, it would do so, if the handle were bent so that it did not cut off the current when it showed itself at neutral on the dial on the outside of the 'control box.' But it is quite another thing to say that, after the winch had come to a stop by a motion of the handle, it would start up again without any change in the position of the handle. Yet this is what we must accept, if the only testimony is true which describes what happened—testimony, incidentally, that came from the mouth of a longshoreman, who was almost certainly unacquainted with the structure of the winch and who spoke through an interpreter."

There is no testimony that the insulation on the wires was worn or that they were bare, nor is there any testimony that the insulation on these four wires was damp or wet. There is testimony by the libelant that the insulation re-

sistance in cables and conduits could be checked with a "megger." There is further testimony that a heater is provided inside of this master control switch box containing the four wires in question and that the function of this heater is to prevent condensation and to dry out any moisture which might enter this box.

The Circuit Court stated further as follows (228 F.2d at pages 318–319):

"True, we should have no warrant for taking judicial notice of how the winch might get out of order, but we do have enough acquaintance with the action of electric currents to know that they must pass in an uninterrupted circuit in order to energize a mechanism like a winch. Moreover, we know that, if the winch is once in motion the circuit must be in some way interrupted, or some resistance must be introduced into the circuit, to stop it. According to the winchman a change in the position of the handle had broken the circuit, or had thrown in some resistance; and he had not touched it when the winch started. Hence something must have happened to complete the circuit again, or to throw out a resistance; and if that happened again and again as the witness testified, there must have been some agent sporadically interrupting and restoring the circuit, in addition to the movement of the handle. We cannot agree that it was permissible on the word of such a witness to find that the current acted as though it was bewitched. If d'Ambrosio's testimony was to be accepted, it was essential for the libellant to introduce some evidence of those competent to explain how an electric winch could so behave. * * * *"

The Circuit Court stated (228 F.2d at page 318): "Hence something must have happened to complete the circuit again, or to throw out a resistance; * * *" d'Ambrosio testified that the winch did stop, therefore, something must have happened to complete the circuit again.

Libelant contends that the testimony of Professor Bond supplies the answer. Bond at best gave expert opinion evidence but libelant has presented no proof of defective insulation or dampness in the control box, or that there were any bare or non-insulated wires. Professor Bond testified that one of these agencies had to exist in order for the winch to start to operate after d'Ambrosio had placed the handle in a neutral position. However, there is no probative proof as to what actually caused the winch to sporadically start while the handle was in the neutral or stop position.

The libelant has the burden of proving his cause by a fair preponderance of evidence. It was incumbent on the libelant to introduce in evidence some actual facts upon which Professor Bond could base his opinion. The expert testimony of Professor Bond does not supply the answer. This is particularly true in view of the fact that libelant could have been injured in many other ways. One example only might be cited, if d'Ambrosio, the winchman, did not respond to his gangwayman's signals, his own negligence might well have caused the accident. The expert opinion evidence of Professor Bond did not exclude any other manner of the happening of this accident. As an expert he gave at best his opinion of what could have caused the electricity to energize and move the winch.

It is evident that four wires short-circuiting simultaneously, while entirely possible, is highly improbable. How the short-circuiting of four wires simultaneously would work out percentagewise is difficult to determine, but the Court is convinced that the libelant is not entitled to a decree because he has not sustained the burden cast upon him of proving the ship was unseaworthy, due to the defective condition of the winch in question, by a fair preponderance of the evidence.

A decree, therefore, should be entered for the respondent, United States of America. In view of this decision, the question of indemnity between the United States of America and the impleaded-

respondent, Universal Terminal & Stevedoring Company, Inc., is moot.

A decree may be entered in accordance with this opinion.